### JONES *v.* LUCAS.

1. EVIDENCE—COMMON KNOWLEDGE—CRANBERRY BUSHES.
   It is well known in general that cranberry bushes must have an abundance of water and that they will only grow in a marsh.

2. WATERS AND WATERCOURSES—CRANBERRY HUSBANDRY—EASEMENT OF FLOWAGE—EVIDENCE.
   In suit by owner of cranberry marsh to restrain drainage by defendants, owners of land between marsh and a 4-acre tract that was servient to plaintiffs' right of floodage sufficient for cranberry husbandry, evidence showed that whenever the 4-acre tract was flooded defendants' land was necessarily flooded and had been flooded from time to time for about 60 years.

3. DEEDS—EASEMENTS—FLOODAGE—CRANBERRY HUSBANDRY.
   Where plaintiffs' grantor of lowlands suitable for cranberry husbandry subjected her remaining lands to easement of floodage and then conveyed her remainder to defendants expressly reciting the subjection to domination by rights under the deed to plaintiffs, lands of defendants became servient to right created in favor of plaintiffs.

4. WATERS AND WATERCOURSES—CRANBERRY HUSBANDRY—DIKES—WATER LEVEL—DEEDS—FLOODING.
   Maintenance of dike used for purpose of storing waters for use in cranberry marsh and right to maintain water level sufficient for cranberry husbandry *held,* to be within rights of plaintiff owners notwithstanding it resulted in some flooding of defendants' lands where latter's lands had been subjected to position of servient tenement by deeds from their common owner to plaintiffs and defendants and dike was built prior to deed to plaintiffs.

REFERENCES FOR POINTS IN HEADNOTES
[2–4] 56 Am Jur, Waters, §§ 163, 165, 166.
[3, 4] 17 Am Jur, Easements, § 128.

5. SAME—CRANBERRY HUSBANDRY—FLOODING—DRAINAGE—DEEDS.

Where plaintiffs established their right to flood such of defend-· ants' lands as were necessary to cranberry husbandry upon plaintiffs' near-by lands, he also established the right to prevent defendants from draining their lands to render them tillable where drainage of such lands would withdraw water from cranberry marsh in violation of covenants in deeds to the parties from their common grantor.

6. SAME—CRANBERRY MARSH—FLOODAGE—BENCH MARK—EVIDENCE.

In suit to restrain defendants from draining their land, thereby ruining plaintiffs' cranberry marsh, evidence required finding that the general level of land in lower portion of tract servient to granted easement of floodage by plaintiffs is the proper bench mark to indicate the height to which plaintiffs may flood their lands and that plaintiffs may maintain ditches, dikes and culverts to such mark.

Appeal from Monroe; Golden (Clayton C.), J. Submitted October 6, 1949. (Docket No. 40, Calendar No. 43,939.) Decided December 8, 1949.

Bill by Milton F. Jones and another against Stephen Lucas and wife to restrain them from draining certain portions of their land. Cross bill by defendants against plaintiffs to restrain plaintiffs from unnecessarily flooding defendants' land. Bill and cross bill dismissed after hearing. All parties appeal. Injunction granted plaintiffs on bill of complaint.

*Floyd S. Willett,* for plaintiffs.

*Kelley & Kelley,* for defendants.

REID, J. Plaintiffs filed the bill in this case to restrain the draining of lands owned by defendants adjacent to a cranberry marsh owned by plaintiffs, under a claim that plaintiffs had by grant a dominant estate, subjecting the lands of defendants in a swamp· area to a water level of a height suitable for the

growth of cranberries. Defendants filed a cross bill requesting an injunction restraining plaintiffs (cross-defendants) from causing water to flow upon the lands of defendants and cross-plaintiffs. From a decree dismissing both the bill and the cross bill, all parties appeal. We shall refer to plaintiffs and cross-defendants as Jones, and to defendants and cross-plaintiffs as Lucas.

The critical point in issue in this case is the height to which water should be maintained in a marsh used for the production of cranberries, which require an abundance of water, as affecting adjacent lands lying at or near the level of water in the cranberry marsh.

In 1941, Mrs. Stone, then the owner of the lands now owned by Jones and, also, of the lands now owned by Lucas, made a contract to sell the lands to Jones which he now owns, and in 1944 Mrs. Stone gave Jones a warranty deed of the lands which she had contracted to sell to him, in which land contract and deed there was recited the following:

"Together with and including all water rights and easements heretofore purchased for, and made appurtenant to these premises, for the purpose of cranberry husbandry, including the right to drain along and into the two established ditches with which these premises are now connected, in the same said quarter section; and including also the right to flood these dominant lands herein contracted to be sold, and to flood the adjacent servient premises of first party, to the extent necessary for reasonable cranberry husbandry, but in no event shall such floodage be in excess of the uses and user practiced concerning these premises in the past; and in no event shall the rights to drain into these established ditches include the right to exceed and overflow the banks of the said ditches."

After the deed to Jones, Mrs. Stone deeded to Lucas the premises he now owns and which are involved in this case and in the deed, by suitable phraseology, the lands of Lucas were subjected to the same dominant estate created in the deed to Jones.

About 1885, a Mr. Everett owned the entire southeast quarter of section 24 of Summerfield township, Monroe county, Michigan, besides some lands outside of the said quarter section. The cranberry marsh in question is situated in the central and easterly portion of the southeast quarter. There are high lands in the southerly part and also in the northerly part of said southeast quarter section. Wild cranberries were observed growing and Mr. Everett determined to cultivate the marsh for cranberries and planted in so-called domesticated or imported cranberry bushes. It is well known in general and proven as a fact in this case, that cranberry bushes must have an abundance of water and they will only grow in a marsh. Mr. Joshua West testified that Mr. Everett in 1886 planted the entire marsh to cranberries. There is an indication in the testimony that the extent of his cultivation might be estimated at about 80 acres. Evidently the extent of acreage under cultivation for cranberries has varied greatly from 1886 to 1944, the date of the deed to Jones.

There is a highway known as the Wells road that runs along the easterly side of said southeast quarter, and this road was built up by Mr. Everett under an arrangement with the public authorities, to hold back the water in his cranberry marsh immediately adjacent to the west of the road; opposite approximately the middle of the easterly side of the cranberry marsh there was a sluice or bridge or culvert through and under the Wells road large enough to permit the outflow of water to the easterly from

the cranberry marsh, easterly being the direction in which waters would naturally flow from the marsh. The marsh receives an inflow of waters in the course of nature from the north, from the west and from the south. At the culvert on Wells road there was planking arranged by Mr. Everett which could be lifted or lowered so as to suitably regulate the height of water on the cranberry marsh.

Mr. Joshua West testified that he began to work for Mr. Everett in 1885 and that he worked for Mr. Everett yearly as needed about the production of cranberries from year to year for the most part, until about 1914. In the spring they would let off the water in June about the time when the cranberries would begin to bloom.

There was a public highway called the Todd road going easterly and westerly along the southerly side of said southeast quarter. Mr. Everett purchased a tract of about 4 acres (known as the Breitner 4 acres) on the southerly side of the Todd road because it was low ground and he needed the use of the 4 acres for the purpose of having a lawful right to flood his lands to a height that would cause flooding of the 4 acres, and Jones claims the lower ground on the 4-acre tract on the southerly side of the Todd road constitutes his bench mark or mark to the height of which water had been controlled and could and ordinarily would be controlled, regulated or permissibly and properly flooded in the tract occupied and operated by Mr. Everett (and later by Jones) on the northerly side of the road, the cranberry marsh in question.

Joshua West testified,

"We would flood the land across the Todd road to the south. That is what that there 4 acres was bought for off of Breitner's land."

Witness Claude West testified,

"If there was water on this 4-acre piece south of the Todd road, there would be water across the road and plenty of it."

Witness George Sommers testified,

"The piece of property right across the road from the 4-acre piece was low ground. To the left of that low ground, that was wet. I think the water naturally would have to drain from that 4-acre piece into the cranberry marsh."

After carefully considering all the testimony, we conclude that the 5-acre tract of Lucas, hereinafter described, was necessarily flooded whenever the Breitner 4 acres was flooded.

Along the Todd road on the southerly side of the quarter section there extends a 5-acre tract westerly from near the middle of the south side of the quarter section in question, covered with marsh grass that grows up in bunches. This tract Lucas desires to drain, so as to make it a tillable field.

Lucas' 5-acre tract during all the period in which cranberries were cultivated in the cranberry marsh, had never been used as a cultivated field. In some seasons it was pasture land and in very wet seasons it was evidently so wet as to be scarcely fit even for pasturage purposes. Witness Hilda Breitner testified,

"The land directly across the road from * * * [the Breitner four acres] is a marsh. That never was cultivated. It was used for a pasture."

The digging of a ditch deep enough to drain the 5-acre tract so as to make it a tillable field, would by seepage or direct surface run-off, withdraw waters from the cranberry marsh and cause the cranberry marsh to become dry. This would be true even if Lucas' contention is correct that his 5-acre tract is 2 feet higher than the growth in the cranberry marsh, for the reason that the cranberry marsh must be

flooded at times to approximately 2 feet of water, so that the water at such times would be on a level with the ground of Lucas' 5 acres, according to Lucas' own theory, and 2 feet higher than the proposed ditch. In fact, however, from all the testimony we conclude that the 5-acre tract of Lucas is in places only a few inches higher than parts of the cranberry marsh; this is revealed from an examination of Lucas' map, exhibit A.

Lucas claims that the lands he proposes to drain for cultivation (the 5 acres) are about 2 feet higher than the cranberry marsh and that the cranberry bushes are only 18 to 24 inches high, with the result that Lucas' 5-acre tract and other of his lands need not be flooded at all for the furnishing of water to meet the requirements of good husbandry of cranberries in the marsh of Jones. However, such claim of Lucas overlooks the fact that there are variations in level in the cranberry marsh proper of about a foot and similar variations in Lucas' 5-acre tract. Opposed to the claim and theory of Lucas just stated is the fact that from 1886 to the time Lucas first had a lease (in 1941) on the property he now owns, the 4-acre Breitner tract had been flooded as needed to take care of cranberry production in the cranberry marsh in question, and such flooding seems to have been found necessary at times during that period.

If none of Lucas' lands need be flooded in the maintenance of a proper water level in the marsh for cranberry production, there would have been no occasion to provide Jones with any dominant estate by Mrs. Stone, then the owner of all the lands that, Lucas owns in the quarter section in question. Moreover, there would in such case have been no need or occasion to reserve such right from operation of the deed from Stone to Lucas. Lucas' own deed from Mrs. Stone bears at least some inference of the fal-

sity of his claim that all his lands are exempt from flowage for cranberry production in the marsh of Jones.

After the death of Mr. Everett, his estate sold the cranberry marsh to Mrs. Stone in 1919. Thereafter Mrs. Stone operated the cranberry marsh and began living on the premises in the fall of 1932. Mrs. Stone continued to operate the cranberry marsh until 1936, when she leased the premises to Jones, at which time (1936) cranberry production had shrunk to about 4 acres. Jones found that the cranberry production required the holding back of water in a reservoir to flood the cranberry marsh when the water in the marsh became too low. There was a roadway which also operated as a dike, shown on plaintiff's exhibit No 1 as the "old dike," which extended from the high ground in the northwest corner of said quarter section down to the high ground on the southerly side of said quarter section. The embankment acted both as a road to drive on and as a dike to hold back the water from running out of the marsh.

Jones at the present time has 30 acres under cranberry production.

In 1937, Jones began the building of what is shown on plaintiff's exhibit No 1 as the "new dike," which runs a course nearly north and south and nearly across the middle of the said quarter section, from high ground on the northerly side of the tract and joins the "old dike" near the southerly end of the "old dike" toward the southerly side, and between the old and new dikes there was introduced water coming into the area from the north. The result of the new dike was to hold back water in a reservoir to be available for the flooding of the marsh, the water being of course impounded in a period of high water and released in suitable quantity at a time

when it was necessary that the cranberry marsh receive more water.

Much of the difference between the parties seems to originate out of the construction of the new dike, which was nearly completed by Jones in 1939. Lucas claims that the construction of this dike and the flooding of water into the marsh by Jones by this means and also from alleged improper control of the water level by the planking at Wells road, is an operation that Lucas is entitled to be relieved from and that it is against Lucas' rights and interests.

The two points that are in dispute are first on the part of Jones, that he desires that Lucas be restrained from draining the 5-acre tract, which will dry out and underdrain land which is nearly on the level of the cranberry marsh and thereby by underground seepage or surface run-off lower the level of the water in the cranberry marsh. Secondly, Lucas desires that Jones be restrained from flooding the marsh, evidently meaning that he shall not by the use of waters held in the reservoir back of the new dike or otherwise, flood the cranberry marsh to such extent as to bring about the flooding of Lucas' land, including the 5-acre tract.

Jones was a tenant under Mrs. Stone from 1937 for 5 years and as we have noted, did the work so far as it was done, in building the new dike during the years 1937, 1938 and 1939. In 1941, Jones on land contract bought the larger part of the southeast quarter from Mrs. Stone, being for the most part the lower lands, mostly in the central and easterly part of the southeast quarter, and including the cranberry marsh and some higher lands. Mrs. Stone was then still the owner of the remainder of the southeast quarter.

February 18, 1944, Mrs. Stone deeded the marsh and some adjacent lands to Jones and in her deed granted as against her remaining lands (the lands

now owned by Lucas) the same dominant rights of flowage and maintenance of water level as to the cranberry marsh as set forth in her land contract and under the same conditions as in the land contract. By deed dated March 5, 1945, Mrs. Stone sold the remaining parcels owned by her in said southeast quarter to Lucas, but recited that lands so deeded by her to Lucas were subject to the same domination that had been granted to Jones, so that the lands deeded to Lucas became servient lands to the dominant estate created in favor of lands then owned by Jones.

Mrs. Stone was sworn as a witness. She lived on land afterward sold to Lucas in the southeast part of the southeast quarter for a few years after first going there in 1932. She testified that she did not know of any other dam or dike or water control than the control planking at the bridge or culvert on the Wells road on the easterly side of the cranberry marsh as controlling the water level of the marsh, but her deed recited, as above quoted, that there were 2 established ditches on her premises. She testified further that as to the new dike that Jones testified to having placed on the premises during the 3 years, 1937, 1938 and 1939, she could not see that part of the marsh from her house and says that she never went out onto the marsh after she leased it to Jones.

It must be considered that the new dike holding in place the reservoir of waters behind the new dike was within the provisions of the warranty deed as granted to Jones and that Jones has the right to use the new dike for the purpose of the reservoir as claimed by Jones because the new dike was in existence and had been used during part of the tenancy by Jones and before the deed from Stone to Jones.

Lucas has no right to restrain Jones in the exercise of the control and general flowage of waters to

the level of the low ground in the Breitner 4 acres, for such flowage is within the limits of Jones' deed.

The trial judge found that Lucas had not proved the facts on which he relied to obtain an injunction against Jones, and in that particular the decree appealed from is affirmed.

We find that Lucas has no right to decrease the height of water in the cranberry marsh below the limits described in his deed from Mrs. Stone.

The trial judge found that Jones had not established his right to prevent draining of the 5-acre tract by Lucas. We cannot concur in such finding. We consider the testimony sufficient to prove that drainage of the 5 acres as proposed by Lucas would be a violation of the covenants in the deed to Jones and not warranted by the covenants in the deed received by Lucas from Mrs. Stone. Lucas has not by satisfactory proof shown that Jones has flooded any of Lucas' lands except as necessary for cranberry husbandry.

We find that the general level of the land in the lower portion of the Breitner 4 acres is the proper bench mark to indicate the height to which Jones may flood the lands of Lucas; that ditching and draining Lucas' 5-acre tract in question would drain Jones' marsh contrary to the terms of the deed from Mrs. Stone to Jones. The grant of dominance contained in the deed from Mrs. Stone to Jones is found binding on Lucas; Jones is entitled to maintain all ditches and dikes described or spoken of in the testimony including the so-called "old dike," the "new dike" and the Wells road culvert or sluiceway, to the height of general level of the low land on the Breitner 4 acres.

The cross bill of Lucas is dismissed. The injunction prayed for by Jones is granted. A decree will be entered in this Court in accordance with this

opinion. Costs in favor of plaintiffs Jones against defendants Lucas.

Sharpe, C. J., and Bushnell, Boyles, North, Dethmers, Butzel, and Carr, JJ., concurred.